BALLY, INC., Plaintiff–Appellee,

v.

M.V. ZIM AMERICA, her engines, boilers, etc., Defendant,

Zim Container Service, Zim Israel Navigation Co. Ltd., Shoham Maritime Services Ltd., Defendants–Appellants.

No. 712, Docket 93–7255.

United States Court of Appeals, Second Circuit.

Argued Feb. 7, 1994.

Decided April 20, 1994.

Vincent M. DeOrchis, New York City (John Orzel and P. Michael DeCharles, DeOrchis & Partners, New York City, of counsel), for defendants-appellants.

William R. Connor III, New York City (John E. Cone, Jr., Bigham, Englar, Jones & Houston, New York City of counsel), for plaintiff-appellee.

Jeffrey F. Lawrence, David F. Smith and Torbjörn B. Sjögren, Sher & Blackwell, Washington, DC, for amicus curiae Ocean Carrier Conferences.

Chester D. Hooper and Delia L. Peters, Haight Gardner Poor & Havens, New York City, for amicus curiae American President Lines, Ltd., and Sea–Land Service, Inc.

Before: MINER and McLAUGHLIN, Circuit Judges, and CONNER,* District Judge.

MINER, Circuit Judge:

Defendants-appellants Zim Container Service, Zim Israel Navigation Co., Ltd. and Shoham Maritime Services, Ltd. (collectively "Zim"), appeal from a judgment entered on February 24, 1993 in the United States District Court for the Southern District of New York (Keenan, J.), awarding plaintiff-appellee Bally, Inc. damages in the amount of $48,-819.73, plus pre-judgment interest at a rate of eight percent, for loss to a shipment of shoes and other leather goods shipped aboard the defendant-vessel M.V. ZIM AMERICA. The goods were shipped from Leghorn, Italy to New York in two sealed containers. When later opened at Bally's warehouse in New Rochelle, New York, 65 cartons of goods were missing from one of the containers. After a bench trial, the district court issued findings of fact and conclusions of law in which it held that Bally had established delivery of the full shipment of goods to Zim and a shortage in the cargo at outturn, thereby proving a prima facie case for recovery under the Carriage of Goods by Sea Act, ("COGSA"), 46 U.S.C. App. §§ 1300–1315. Concluding that Bally has not demonstrated that the cartons were missing from the sealed container at outturn, we reverse and remand with instructions to dismiss the complaint.

## BACKGROUND

The facts of this case are largely undisputed. In August of 1990, Bally engaged Odino–Valperga Italeuropa S.p.A. ("Odino"), a large freight-forwarding agency, to consolidate several shipments of leather goods Bally had purchased from six different Italian manufacturers and arrange for their shipment to Bally's warehouse in New Rochelle, New York. The shipments were delivered to Odino's Florence, Italy warehouse in early August. Odino booked the cargo in question with Zim, through Zim's agent.

Cartons containing the goods were loaded into two containers on August 23, 1990 under the supervision of Gaetano Trinca of Odino. Trinca personally noted that 301 cartons were loaded into the container in question, number ZCSU 241429/4, and that each of the shipments comprising that total and listed on Odino's waybill was loaded into the container. No problems were observed with any of the 301 cartons. The other container, number ZCSU 203753/9, was loaded with 273 cartons. That container and its contents arrived at New Rochelle in good order, and are not at issue in this case.

After it was loaded, Trinca sealed container ZCSU 241429/4 by placing a high-security steel seal, number 000013, on the latch, thereby locking the handle on the container doors. He also attached to the container an additional customs seal made of rope. The parties do not dispute that seal 000013 remained intact until it was broken at Bally's New Rochelle warehouse. The same day that the seals were affixed, both containers were transported from the Odino warehouse in Florence to the pier at Leghorn by Autotransporti FI.SA, s.r.l., an Italian trucker hired by Zim.

At the pier, the container, the truck and the chassis were weighed, and the weight was recorded on the truck driver's delivery order ("buono di imbarco"). By subtracting the weight of the truck, the chassis and the container from the gross weight, it was determined that the net weight of the cargo inside the container was 4,400 kilos. This weight matched almost exactly the weight Odino declared on the bill of lading, 4,396.8 kilos, which was calculated from the weights listed on the manufacturers' invoices and packing lists. After it was weighed, the container was moved about 300 yards to a container storage yard on the pier, where it was stored for six or seven days.

On August 30 or 31, 1990, the container was loaded on the ZIM AMERICA, where it was stowed above deck, with other containers above and below it. The bill of lading issued

* Honorable William C. Conner of the United States District Court for the Southern District of New York, sitting by designation.

by Zim on August 30, 1990 described the container as "1X40' BOX SAID TO CONTAIN" (followed by an itemization of the goods) and was stamped "Said to Contain Shipper's Load, Stow and Count."

The ZIM AMERICA embarked for New York on August 31, 1990 and arrived at the Maher Terminal in the Port of New York, on September 17, 1990. Maher is the stevedore for Zim in the Port of New York. Later that afternoon, the Bally containers were delivered to Maypo Trucking Corporation, which had been hired by Bally. Zim did not have the containers weighed prior to delivering them to Maypo, although there were scales available in the outbound lane at the Maher Terminal. Anthony Tricarico, a trucker employed by Maypo, arrived to pick up the containers. Tricarico inspected the seals on the containers and found seal 000013 to be intact. Observing no problems with the containers, Tricarico did not request to have them weighed at the Maher Terminal and did not bring them to any of the several commercial weigh stations nearby. Since it was late in the day, Tricarico drove directly to Ship's Side Services Inc. (known in the trade as "Port Security") to store the containers for the night. Certain precautions were taken to ensure the safety of the containers, such as placing additional seals and locks on the containers' doors.

The next morning, John Lucatuorto, another Maypo truck driver, checked the containers out of Port Security. No problems with the containers had been reported, nor were there any reported breaches of security. Lucatuorto drove to Bally's warehouse, where he was met by Hiram Quesada, Bally's receiving manager. Seal 000013 was still intact when container ZCSU 241429/4 was received. Lucatuorto and Quesada cut the seal, and the truck was taken up to the loading dock. Bally personnel then emptied the container under Quesada's supervision. Quesada testified that, when the container was opened, he noticed that it was not full.

Lucatuorto and Quesada counted the cartons as warehouse personnel removed them from the container. Sixty-five of the 301 cartons originally loaded in the container were missing.[1] Quesada notified Paul Caterina, Bally's traffic manager, that some cartons were missing. Following Caterina's instructions, the cartons were sorted by invoice and packaging list. The 236 cartons received were opened and no shortages were found inside the cartons.

On September 25, 1990, eight days after delivery, Bally's surveyor telephoned Zim to request an inspection of container ZCSU 241429/4. Zim subsequently examined it and found that the door hinges never had been removed. Approximately three weeks after delivery, Bally sent Zim a claim statement dated October 10, 1990 for the amount of the loss. Zim denied liability and, accordingly, refused to pay.

Bally filed this COGSA action in August of 1991. Following a bench trial, the district court issued findings of fact and conclusions of law dated February 1, 1993, 91 CIV. 5501, 1993 WL 33466, 1993 U.S.DIST. LEXIS 926 (S.D.N.Y. Feb. 1, 1993). Finding that the clean bill of lading issued by Zim established that Zim had received the cargo in good order and noting that Zim had stipulated that sixty-five cartons were missing when the cargo was unloaded at Bally's warehouse, the district court concluded that Bally had established a prima facie case for recovery under COGSA. The district court also concluded that Zim had failed to establish the COGSA defense that it was not at fault, since it "wholly failed to prove that [it was] free from negligence." This appeal followed.

## DISCUSSION

A plaintiff-consignee establishes a prima facie case for recovery under COGSA by demonstrating that the goods were damaged while in the defendant-carrier's custody.

---

1. There was some evidence of irregularities in the procedure used to receive and inventory the shipment. Although cartons were missing, Quesada wrote on the delivery receipt "one sealed container" without noting an exception on the receipt pursuant to Bally's procedure. Only later did Quesada write "236 ctns" on his own copy of the receipt. Additionally, while Quesada testified that he told Lucatuorto that sixty-five cartons were missing, Lucatuorto did not recall being told of the shortage.

*See Caemint Food, Inc. v. Brasileiro,* 647 F.2d 347, 351–52 (2d Cir.1981); *Leather's Best Int'l, Inc. v. MV Lloyd Sergipe,* 760 F.Supp. 301, 308 (S.D.N.Y.1991). It is well settled that this burden can be met by proving "(1) delivery of the goods to the carrier in good condition and (2) outturn by the carrier in damaged condition." *Westway Coffee Corp. v. M.V. Netuno,* 675 F.2d 30, 32 (2d Cir.1982). "When the consignee proves its *prima facie* case, the burden shifts to the carrier to show that the loss or damage falls within one of the COGSA exceptions set forth in [46 U.S.C. App. § 1304(2)]." *Id.*

██ The district court found that Bally had met the first prong of its prima facie case based on the weight and description of the cargo in the bill of lading issued by Zim. "[T]he weight listed on a bill of lading is *prima facie* proof of receipt by the carrier of that weight regardless of attempted reservations like 'said to weigh,' 'shipper's load and count,' and 'contents of packages are shipper's declaration.'" *Id.* A clean bill of lading does not, however, constitute prima facie evidence of the condition of goods shipped in sealed packages where the carrier is prevented from "observing the damaged condition had it existed when the goods were loaded." *Caemint Food,* 647 F.2d at 352. Accordingly, the bill of lading in this case was prima facie proof of the weight of the cargo loaded at Leghorn. However, it was not of itself prima facie evidence of the number of cartons within the sealed containers because that aspect of the cargo was not ascertainable from any external examination of the containers. Since Bally did not weigh the cargo at outturn and seeks to prove its loss through evidence of the number of missing cartons, some other evidence was needed to establish the number of cartons loaded at Leghorn. *See Westway Coffee Corp. v. M.V. Netuno,* 528 F.Supp 113, 115 (S.D.N.Y.1981) (number of cartons of instant coffee loaded into container was consistent with weight declared on bill of lading; prima facie case proven by evidence of missing cartons at outturn), *aff'd,* 675 F.2d 30 (2d Cir.1982); *Leather's Best,* 760 F.Supp. at 304–05 (cargo of leather was weighed before it was divided among ten pallets and placed in sealed container; five pallets missing at outturn suffi-

cient to prove prima facie case against carrier). The district court had such evidence before it.

Trinca testified that he observed 301 cartons loaded into the container prior to sealing, and the number of cartons loaded into the container was correlated with the weight of the cargo through the manufacturers' invoices and packing lists. There was an adequate evidentiary basis for the district court to find that Bally established the weight of the cargo and the number of cartons inside the container when it was delivered to Zim at Leghorn. Accordingly, the district court's finding that Bally had established the first prong of its prima facie case was not clearly erroneous.

The second prong of the prima facie case—damage at outturn—is more problematic. Based solely on the parties' stipulation that sixty-five cartons were missing when the container was inventoried at New Rochelle, the district court concluded that Bally had demonstrated a shortage of cargo at outturn. It appears that the district court incorrectly identified the point of outturn. "Outturn" occurred when Zim delivered the containers to Bally's agent, Maypo, at the Maher Terminal on September 17, 1990. *See, e.g., Nissho–Iwai Co. v. M/T Stolt Lion,* 719 F.2d 34, 38 (2d Cir.1983) (outturn occurs "at the time of discharge"); *J. Gerber & Co. v. S.S. Sabine Howaldt,* 437 F.2d 580, 584 (2d Cir.1971) (outturn occurs upon delivery at port of destination). It was at that location that Bally was required to establish the loss.

██ By proving, through a stipulation, only that the cartons were missing when the container was inventoried at its warehouse in New Rochelle, Bally did not rule out the possibility that the goods were pilfered while in Maypo's custody, while stored at Port Security, or during or after unloading of the container at the Bally warehouse. It is true that there was some evidence presented, such as the security measures taken by Port Security, which Bally contends establishes that the loss did not occur after Maypo took delivery of the goods from Zim. But there also was substantial evidence that the loss did not occur while Zim controlled the con-

tainer, the most important of which is the fact that the container was sealed the entire time it was in Zim's custody. The significance of a security seal in a case such as this of course will depend on the unique facts of the case.[2]

Delivery by a carrier of a container with an intact seal does not conclusively prove that loss did not occur while the container was in the carrier's possession. In *Westway*, for example, a cargo of instant coffee was shipped in sealed, padlocked containers. Upon receipt by the consignee, the seals were broken and it was discovered that 419 cartons of coffee weighing about twenty tons were missing from the containers. We upheld the district court's finding that the carrier was liable based on our conclusion that the consignee had established by a preponderance of the evidence that there was a shortfall in weight at delivery. 675 F.2d at 33. Although we did not consider the significance of the seal, the district court in that case had concluded that the unnumbered wire seals easily could have been removed and duplicated. 528 F.Supp. at 117–18; *see also Leather's Best*, 760 F.Supp. at 306–07 (holding carrier liable even though it delivered sealed container where seal was frail and rusted and container was damaged). Here, there was no evidence that the container had been tampered with, and Bally does not suggest that the high-security seal had been breached. Based on our review of the record in *this* case, we conclude that there was insufficient evidence for the district court to conclude that the cartons were missing from the sealed container when it was delivered by Zim at the Maher Terminal.

Bally argues that it was entitled to judgment because Zim had the obligation of weighing the container at the Maher Terminal to prove that there was no shortfall in the weight of the cargo. The district court apparently agreed. Relying on a footnote in our *Westway* decision, 675 F.2d at 33 n. 4, the court stated that it is generally the carrier and not the consignee that has the obli-

gation of weighing a sealed container upon delivery at the port of destination. Zim and amicus curiae Ocean Carrier Conferences assert that it is commercially impracticable for carriers to meet this burden because ocean carrier terminals, such as the Maher Terminal, generally are equipped to weigh only outbound containers. Indeed, there was evidence presented in this case that it is highly unusual for a carrier to request to have an inbound container weighed at the Maher Terminal. On the other hand, there were numerous commercial weigh stations available in the area at which Maypo could have weighed the Bally containers at a nominal cost.

We never have held that the carrier has the obligation of weighing cargo at the time of delivery, and COGSA does not impose such an obligation on either party. Our statement in *Westway* is not to the contrary. There, the consignee had proven by documentary evidence a shortfall in weight at outturn; we merely noted that had the carrier actually weighed the containers at loading and again at unloading, it might have rebutted the consignee's prima facie case. 675 F.2d at 33 n. 4. By no means did we suggest that a carrier has an obligation to weigh containers at unloading. *See also Spencer Kellog, Div. of Textron, Inc. v. S.S. Mormacsea*, 703 F.2d 44, 45–46 (2d Cir.1983) (having failed to measure cargo itself, carrier could not attack shortages established by documentary evidence). If a sealed container is weighed both when it is delivered to the carrier and at the port of destination, unquestionably it would be easier to pinpoint where any cargo was lost from the container. In this case, Bally had the initial burden under COGSA of proving that the cargo was lost while it was in Zim's custody. Had it weighed the container while it still was sealed, and thereby demonstrated a shortfall in weight at outturn, Bally would have had a better case against Zim. Having failed to do so, and also having failed to prove by other

---

**2.** Zim additionally asserts that the fact that the seals on the container remained intact throughout the time it was in its custody establishes the defense that it was free from fault. 46 U.S.C. App. § 1304(2)(q); *see Roco Carriers, Ltd. v. M/V*

*Nurnberg Express*, 1989 AMC 2527, 1989 WL 66675 (S.D.N.Y.), *aff'd*, 899 F.2d 1292 (2d Cir. 1990). As we conclude that Bally has failed to establish a prima facie case, we need not address the defenses asserted by Zim.

evidence that the cargo was lost while it was in Zim's custody, Bally has not met its burden in this case.

 Our holding in this case is further supported by section 3(6) of COGSA, 46 U.S.C. App. § 1303(6). The section provides, in relevant part:

> Unless notice of loss or damage and the general nature of such loss or damage be given in writing to the carrier or his agent at the port of discharge before or at the time of the removal of the goods into the custody of the person entitled to delivery thereof under the contract of carriage, such removal shall be prima facie evidence of the delivery by the carrier of the goods as described in the bill of lading. If the loss or damage is not apparent, the notice must be given within three days of the delivery.

46 U.S.C. App. § 1303(6). As Zim notes, the district court did not consider the import of this section because it concluded that "it is undisputed that Plaintiff gave Defendants timely notice of the missing goods." However, Bally did not provide Zim with written notice of the missing cartons until three weeks after it discovered the loss; even oral notice, through the telephone call from Bally's surveyor, was not received by Zim until eight days after delivery of the containers. We thus are unable to discern the basis for the district court's conclusion that notice was timely. Accordingly, the district court erred by not properly applying section 3(6).

 When the plaintiff fails to give timely notice, section 3(6) creates a presumption that the carrier delivered the cargo in good order. *See, e.g., Leather's Best,* 760 F.Supp. at 309. The presumption normally is not conclusive, and it disappears from the case once the consignee comes forward with sufficient evidence that the cargo was damaged or short prior to delivery. *See Pacific Employers Ins. Co. v. M/V Gloria,* 767 F.2d 229, 238 (5th Cir.1985); *Nissho–Iwai v. M/T Stolt Lion,* 617 F.2d 907, 912 n. 4 (2d Cir.1980) (clear evidence that damage to cargo occurred just prior to or soon after discharge rebutted presumption of good delivery). In this case, there was virtually no evidence that the loss occurred prior to delivery. Indeed,

as the district court itself recognized, "The fate of the 65 cartons is still unknown."

There is insufficient evidence in the record to support a finding that the 65 cartons of leather goods were missing at outturn. Even if we had some doubt on this point, there certainly was insufficient evidence to overcome the presumption of good delivery created by section 3(6). Accordingly, Bally has failed to prove the second prong of its prima facie case under COGSA.

## CONCLUSION

For the foregoing reasons, we reverse the judgment of the district court and remand the case with instructions to dismiss the complaint.